Jeffrey A. James
B. Jason Rossiter
Sebris Busto James
14205 SE 36th St., Suite 325
Bellevue, Washington 98006
(425) 454-4233

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

KATHY ALLSTOT,

　　　　Plaintiff,

vs.

CONFLUENCE HEALTH, et al.,

　　　　Defendants.

Case No. 2:16-cv-0373-SMJ

**JOINT STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to Section 7.B of the Court's Scheduling Order (ECF No. 12), the parties submit the following Joint Statement of Uncontroverted Facts pertinent to Defendants' pending Motion for Summary Judgment (ECF No. 40):

　　　1.　　Allstot began working for Central in 2012 as a Nurse Assistant.

　　　2.　　Allstot applied for a transfer to the Contact Center in 2014, and as part of the transfer process she interviewed with Contact Center Manager Kimberly Gullett.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 1

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

3. Allstot mentioned during her interview that she had experienced migraines and that she had taken FMLA leave, but Gullett approved her transfer request anyway.

4. Gullett was the person who hired Allstot into the Contact Center.

5. Allstot began working as a Contact Center Specialist I ("CCS-I") in Central's Contact Center on September 30, 2014.

6. Allstot's position in the Contact Center position was a day-shift position working from 9:00 a.m. until 6:00 p.m.

7. Allstot's job as a CCS-I required her to schedule, cancel, and reschedule appointments with various Confluence providers.

8. Allstot's job required her to take calls from patients about their illnesses, schedule their appointments, and arrange for medication refills.

9. In the Contact Center, Allstot sat in a room of cubicles staffed by other Contact Center Specialists.

10. Calls coming in to the Contact Center would be placed in a queue, and the first available Contact Center Specialist would get the next call in the queue.

11. Allstot's job placed her in continuous contact with patients.

12. Allstot's job required her to comply with clinic and department standards pertaining to the use of paid time off and unpaid absences due to medical reasons.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 2

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

13. Allstot's position in the Contact Center was a full-time, 40-hour-per-week position, and her shift was 9:00 a.m. to 6:00 p.m., Monday through Friday.

14. Allstot could not perform her job as a CCS-I unless she was physically present at work.

15. After Allstot had transferred to the Contact Center, Gullett created a different position called Contact Center Specialist-II ("CCS-II").

16. CCS-II's assisted Gullett with performing some supervisory functions, such as handling employee call-offs, in addition to performing the work of a CCS-I.

17. New rules, and changed rules, for handling incoming patient calls would routinely be circulated to the Contact Center Specialists in huddles and by email; "things changed every day."

18. "Doctor's hours change. Their days off change. And if you're not there every single day to hear about what has changed, then you go in and you make mistakes, unless you have the time to go back and read the huddles before you started taking phone calls."

19. On April 3, 2015, Allstot received a coaching in which she was reminded to "[m]ake sure you are catching up on Huddles when you are not here," to "[s]low down and take some time to make sure you are looking at the Scheduling grid and the restrictions per provider. Grids are changing all the time and with you being out of the office, things are getting missed."

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 3

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

20. Gullett gave Allstot a six-month performance review on May 13, 2015.

21. In this review, Gullett make the following observation: "I am finding the following errors are occurring repeatedly at times, due to her [Allstot] being out of the office: Sending Telephone Encounters and Staff Messages to the incorrect "Pools". Booking patients based on the instruction or grid guidelines of when she was here in the office last. During her absences, we are constantly updating and changing things. I have spoken with Kathy and she is going to work on reading all huddles notes and emails from myself and Marcus Miller when she has been out, before she takes calls and books patients for future appointments. I think that this will alleviate these issues."

22. On June 2, 2015, Gullett issued Allstot a coaching for "rolling calls, taking below average number of calls, still sending Telephone Encounters and Staff Messages to the incorrect pools, taking long breaks/lunches," and having her phone "in work [mode] for an extended amount of time before going to breaks/lunches and leaving for the day."

23. Allstot was cautioned in this coaching that (among other things) she "must double check her work with the routing of all Telephone Encounter and Staff Messages" and that "[w]hen she is scheduled on the phones, she needs to be in 'Ready' state to take calls." She was told that failure to meet and maintain acceptable standards of performance "may result in a formal discipline process."

24. Allstot once made an error in which she typed the wrong year when scheduling a patient's appointment—she typed November 9, *2016*, instead of November 9, 2015—causing him to arrive at the clinic at a time when there was no one available to see him.

25. Allstot was coached repeatedly about her errors.

26. Gullett arranged for extra training for Allstot in response to her errors, and arranged for Lorri Duran, a CCS-II, to sit with Allstot for an entire day so that Duran could observe how she was doing and provide additional training.

27. Allstot also received additional periodic in-person verbal coaching from the CCS-II's.

28. Allstot continued to make mistakes even after going back and reading huddles.

29. Allstot admits that there was nothing inappropriate about Gullett pointing out her errors with respect to patient scheduling.

30. Confluence Practice Managers reached out to Gullett and asked her to do something to address the errors that Allstot was making.

31. Allstot admits that Gullett also counseled other Contact Center Specialists who were making mistakes, but also admits that she has "[n]o idea" about how many ended up receiving counseling or corrective action.

32. On October 29, 2015, Gullett issued Allstot a written counseling statement.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 5

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

33. In this counseling statement, Gullett stated that Allstot "continues to struggle with job performance. She has a high error rate and continues to take lower than the average number of total calls, taking longer breaks/lunches and is still continuing to have an extremely high amount of time in 'Work State', after counseling and coaching."

34. Among the expectations that Gullett listed for Allstot in this statement were that Allstot's "[e]rror rate needs to decrease down to no more than 5 errors in the next 30 days and moving forward" and that she needed to take only "15 minutes each for breaks and 1 hour for lunches."

35. Gullett reminded Allstot in this statement that the "[f]ailure to meet and maintain acceptable standards of performance … will result in further discipline up to and including termination of employment."

36. Allstot received a counseling on November 20, 2015, about inappropriately referring to a patient as "a real witch."

37. Allstot cleaned out her desk on about December 2, 2015, thinking that she would be fired.

38. Allstot admits that her superiors never told her that it was okay to keep making mistakes after she had been trained and coached and counseled. Allstot Dep. 203:14-16.

39. Gullett emailed Allstot on January 19, 2016, notifying her that Central had discovered nine errors made by Allstot in the six weeks between November 27, 2015, and January 14, 2016.

40. Three days after this email, Allstot was presented with a Last Chance Agreement.

41. The Last Chance Agreement stated, in part, that "[b]y signing this Last Chance Agreement you understand that ANY violation of CH's work rules or policies … will result in your immediate termination from employment."

42. The Last Chance Agreement also stated that "[t]here will be no further corrective action taken in the event of a performance, attitude or behavior problem, unapproved tardy, absence or policy violation."

43. The Last Chance Agreement did not make any reference to Allstot's medical condition or to her prior taking of FMLA leave.

44. The only absence pattern described in Allstot's Last Chance Agreement was Allstot's pattern of being tardy from rest and meal breaks: "From 12/3/15-1/12/16, Kathy has 13 occurrences of tardiness from rest breaks and from 12/9/15-1/11/16 she has an additional 10 occurrence of tardiness from lunch breaks. This behavior was addressed on 6/2/15, 10/16/15-updated 11/4/15 and again on 1/11/16."

45. Allstot knew that, by signing the Last Chance Agreement, if she made any mistake, she would be let go.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 7

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

46. The Last Chance Agreement was not just for attendance; "It was for anything. One mistake and you're out the door."

47. Allstot cleaned out her desk again the day after she signed the Last Chance Agreement.

48. Allstot does not dispute that she continued to make errors after signing the Last Chance Agreement.

49. Gullett also informed Allstot during February of 2016 that she had received complaints about Allstot from patients in clinics.

50. Central terminated Allstot's employment on March 1, 2016.

51. When Allstot was fired, she was told that the reason why she was being fired was because she continued to make errors.

52. According to Allstot, "I was told due to my errors and lack of attention to detail that I wasn't a good fit for that particular position at the Contact Center."

53. Brianna Thaut was not part of the decision to terminate Allstot's employment and was never consulted about the decision.

54. Allstot began applying for and taking FMLA leave for her migraines from the start of her employment in 2012.

55. Allstot's balance of available FMLA time never ran down to zero while she was working in the Contact Center.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 8

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

56. If Allstot was unsure about the amount of available FMLA time that she had, she would ask Brianna Thaut of Confluence's Human Resources department, who would provide her with that information.

57. In the fall of 2015, Allstot was not required to re-certify her previously-approved leave request.

58. Allstot's superiors never told her that she was unable to go to the doctor because she did not have enough accumulated FMLA time to cover the absence.

59. Allstot requested recertification of her intermittent FMLA leave in early February of 2016 for her various chronic illnesses because she expected to need time off for appointments with various health care providers as well as if any problems arose.

60. Allstot also requested recertification of intermittent FMLA leave in early February of 2016 to care for her aging mother.

61. Allstot's intermittent FMLA leave recertification requests were approved on February 25, 2016.

62. The employee who handled Allstot's intermittent FMLA leave recertifications in February of 2016 was Brianna Thaut.

63. At the time of Allstot's discharge on March 1, 2016, there were no outstanding-yet-unfulfilled requests from Allstot to miss any work for any reason relating to the FMLA.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 9

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

64. Allstot has no idea of everyone at CWHSA who had taken FMLA leave.

65. Confluence had a written attendance policy that applied to all CWHSA employees, including Allstot.

66. Confluence also had a written absence notification policy that applied to all CWHSA employees, including Allstot.

67. When there are calls in the queue, it is unknown whether the person is calling for emergency or non-emergency reasons.

68. During the time that Allstot worked in the Contact Center, she had reviewed both the attendance policy and the absence notification policy.

69. Allstot admits that she was sometimes tardy.

70. Allstot admits that she was sometimes tardy for reasons such as letting her dogs out, or going to the bank, or other reasons having nothing whatsoever to do with her medical conditions or her FMLA usage.

71. Allstot attributes her long lunches to being "late probably leaving my house from letting the dogs out" and says that this "has to do with traffic."

72. On January 11, 2016, Gullett told Allstot that she had "been taking long lunches lately," that she was "concerned with the amount of them," and that Allstot needed "to be consistent at 1 hour lunches please." Gullett also suggested to Allstot to "[m]aybe set an alarm to help?"

73. Allstot denies that her medications affect her while she is at work.

74. On October 19, 2015, Allstot inquired about the possibility of being transferred a part-time position.

75. Part-time employees are generally required to comply with the same attendance, tardiness, and call-off policies as full-time employees.

76. Allstot had originally transferred into the Contact Center because "it was just getting to be too much doing 12-hour shifts, three in a row, and trying to help my dad at home with my mother."

77. Nurse Assistants in the Resource Unit also routinely perform highly physical tasks such as lifting and dressing patients, helping patients with toilet activities, assisting with patient transport, and setting up and cleaning rooms. Nurse Assistant positions require continuous walking, and frequent standing, reaching above shoulder height, and lifting, pulling and pushing as much as 50 pounds.

78. Allstot does not believe herself presently capable of performing any job involving lifting, such as might need to be done while working in a nursing home.

79. Within a month of her discharge, Allstot filed an application with the Social Security Administration claiming to be totally disabled and unable to work as of March 1, 2016, due to a back injury.

80. Allstot, as of the time of her discharge, had never filed any charge of discrimination or testified or assisted with any enforcement proceedings.

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 11

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005

81. Elizabeth Delgado never requested FMLA leave when she worked for Central.

82. Elizabeth Delgado did not have any medical conditions while she was working for Central.

83. Central placed Elizabeth Delgado on a Last Chance Agreement before she was terminated.

84. Central hired Amanda McBride on November 10, 2014.

85. McBride did not become eligible to take FMLA leave at CWHSA until her one-year anniversary of employment, which was on November 10, 2015.

86. CWHSA placed McBride on a Last Chance Agreement on October 23, 2015.

87. Tom Christensen ("Christensen") is Director of Talent Engagement at Confluence.

88. Kimberly Gullett ("Gullett") is the Contact Center Manager for Confluence.

89. Kaci Ramsey ("Ramsey") was an Employee Relations Specialist at Confluence during the time that Allstot worked there.

90. Elizabeth Delgado ("Delgado") was a Contact Center Specialist at Confluence and worked with Allstot.

91. Amanda McBride was a Contact Center Specialist at Confluence and worked with Allstot.

92. Allstot began employment with Confluence in working in the Resource Department, floating as a CNA, and then transferred to its Emergency Department in 2013, before transferring to its Contact Center as a Contact Center Specialist.

93. In order to obtain FMLA leave, Confluence requires its employees to specifically request it.

94. Ramsey claims she coached Allstot, with Gullett, on attendance and performance issues.

95. But Ramsey nevertheless sought to reduce Allstot's absences from work.

96. Gullett was unaware if Allstot's Migraines affected her ability to work.

97. Many or all of the Contact Center employees were late to their shifts at one time or another.

98. There were Contact Center employees were late multiple times but were not terminated.

99. Employees that are sick are advised to stay home.

100. Confluence terminates employees if they do not sign Last Chance Agreements.

101. Allstot's termination was based upon her Last Chance Agreement.

102. Allstot would schedule her medical appointments after hours in order to accommodate Gullett.

103. Confluence does not normally count medical leave for flu the against its employees.

104. Allstot received recertification for her FMLA leave on February 25, 2016.

105. Confluence Operators transfer incoming calls to the Contact Center.

106. Aside from Allstot, Ramsey claims she coached two other Contact Center employees on performance issues, but they were not terminated.

DATED this 27th day of July, 2018.

SEBRIS BUSTO JAMES

/s/Jeffrey A. James
Jeffrey A. James, WSBA #18277
B. Jason Rossiter, WSBA #44732
14205 SE 36th St., Suite 325
Bellevue, Washington 98006
(425) 454-4233
jaj@sebrisbusto.com
jrossiter@sebrisbusto.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on July 27, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF System. The Notice of Electronic Filing for the foregoing specifically identifies recipients of the electronic notice.

*/s/Holly Holman*
Holly Holman

JOINT STATEMENT OF
UNCONTROVERTED FACTS – 15

SEBRIS BUSTO JAMES
14205 SE 36th Street, Suite 325
Bellevue, Washington 98006
Tel: (425) 454-4233 – Fax:(425) 453-9005