FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 17, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KATHY ALLSTOT,

          Plaintiff,

    v.

CONFLUENCE HEALTH, a
Washington non-profit corporation, and
CENTRAL WASHINGTON HEALTH
SERVICES ASSOCIATION, a
Washington Public Benefit Corporation
doing business as Central Washington
Hospital,

          Defendants.

No.   2:16-CV-00373-SMJ

**ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

      Before the Court is the Motion for Summary Judgment, ECF No. 40, brought by Defendants Confluence Health (Confluence) and Central Washington Health Services Association (Central). Plaintiff Kathy Allstot asserts three causes of action—violation of the Family and Medical Leave Act of 1993 (FMLA), disability discrimination under the Washington Law Against Discrimination (WLAD), and wrongful discharge in violation of public policy. ECF No. 1 at 3−5. Allstot's first cause of action involves two claims, namely FMLA interference and FMLA

retaliation. Allstot's second cause of action involves three claims, namely WLAD disparate treatment, WLAD retaliation, and WLAD failure to accommodate.

Defendants ask the Court to grant summary judgment in their favor on all of Allstot's claims, arguing she failed to meet her burden of production on any of them. The Court held a hearing on the motion on August 2, 2018. Having reviewed the pleadings and the file in this matter, the Court is fully informed and, for the following reasons, grants the motion.

## BACKGROUND

Central is a hospital in Wenatchee, Washington.[1] Allstot began working for Central as a nurse assistant in 2012. ECF No. 83 ¶¶ 1, 92. Allstot began taking FMLA leave for migraines from the start of her employment. *Id.* ¶ 54. To take FMLA leave, Confluence required employees to specifically request it. *Id.* ¶ 93. But Central advised employees to stay home if they were sick. *Id.* ¶ 99. And Confluence did not normally count medical leave for the flu against employees. *Id.* ¶ 103.

Allstot applied for a transfer to Central's contact center in 2014. *Id.* ¶ 2. As part of the transfer process, Allstot interviewed with the contact center manager, Kimberly Gullett. *Id.* Ultimately, Gullett was responsible for hiring Allstot into the contact center. *Id.* ¶ 3. In the interview, Allstot mentioned she experienced migraines

---

[1] Confluence and Central appear to be affiliated as parent and subsidiary organizations, though their relationship is not clearly specified in the record. ECF No. 1 at 2; ECF No. 6 at 2.

and had previously taken FMLA leave. *Id.* ¶ 2. Gullett nonetheless approved Allstot's transfer to the contact center. *Id.* At all times relevant to this case, Gullett was unaware whether Allstot's migraines affected her ability to work. *Id.* ¶ 96. Allstot denies that her prescription medications affected her job performance. *Id.* ¶ 73.

Allstot started her job as a Contact Center Specialist I on September 30, 2014. *Id.* ¶ 5. Allstot's job required her to work a full-time dayshift on Monday through Friday from 9:00 a.m. to 6:00 p.m. *Id.* ¶¶ 6, 13. Allstot's duties involved taking telephone calls from patients, including calls transferred from Confluence operators; scheduling, canceling, and rescheduling patients' appointments with various Confluence healthcare providers; and arranging to refill patients' prescription medications. *Id.* ¶¶ 7−8, 105.

Allstot performed her job while seated at a cubicle, surrounded by a room of other cubicles and other contact center specialists. *Id.* ¶ 9. Incoming calls were placed in a queue and the first available contact center specialist would take the next call in the queue. *Id.* ¶ 10. A contact center specialist could not discern whether a call in the queue related to an emergency or nonemergency situation. *Id.* ¶ 67. Allstot's job placed her in continuous contact with patients. *Id.* ¶ 11. Allstot's job required her to comply with clinic and department standards pertaining to the use of

paid time off and unpaid absences for medical reasons. *Id.* ¶ 12. Allstot could not perform her job unless she was physically present at the contact center. *Id.* ¶ 14.

Contact center specialists routinely received "huddles" describing new rules or changed rules for handling incoming calls. *Id.* ¶ 17. Things changed frequently. *See id.* An employee who missed work would make mistakes unless she took the time to go back and read all huddles before taking calls. *Id.* ¶ 18.

On April 3, 2015, Central coached Allstot on her job performance, reminding her to "'[m]ake sure you are catching up on Huddles when you are not here,' to '[s]low down and take some time to make sure you are looking at the Scheduling grid and the restrictions per provider. Grids are changing all the time and with you being out of the office, things are getting missed.'" *Id.* ¶ 19 (alterations in original).

Allstot had her six-month performance review on May 31, 2015. *Id.* ¶ 20. In the review, Gullett made the following observations about Allstot:

> "I am finding the following errors are occurring repeatedly at times, due to her [Allstot] being out of the office: Sending Telephone Encounters and Staff Messages to the incorrect "Pools". Booking patients based on the instruction or grid guidelines of when she was here in the office last. During her absences, we are constantly updating and changing things. I have spoken with Kathy and she is going to work on reading all huddles notes and emails from myself and Marcus Miller when she has been out, before she takes calls and books patients for future appointments. I think that this will alleviate these issues."

*Id.* ¶ 21 (alteration in original).

On June 2, 2015, Central again coached Allstot on her job performance, this time for "'rolling calls, taking below average number of calls, still sending Telephone Encounters and Staff Messages to the incorrect pools, taking long breaks/lunches,' and having her phone 'in work [mode] for an extended amount of time before going to breaks/lunches and leaving for the day.'" *Id.* ¶ 22 (alteration in original). Central cautioned Allstot she "'must double check her work with the routing of all Telephone Encounter and Staff Messages' and . . . '[w]hen she is scheduled on the phones, she needs to be in 'Ready' state to take calls.'" *Id.* ¶ 23 (alteration in original). Central told Allstot her "failure to meet and maintain acceptable standards of performance 'may result in a formal discipline process.'" *Id.*

Allstot's errors persisted. *Id.* ¶¶ 24−28. For example, Allstot once scheduled a patient's appointment for November 9, 2016 rather than 2015, which caused him to arrive at the clinic when no one was available to see him. *Id.* ¶ 24. Allstot admits there was nothing inappropriate about Gullett pointing out her errors regarding patient scheduling. *Id.* ¶ 29.

Central repeatedly coached Allstot about her errors. *Id.* ¶ 25. Gullett arranged extra training for Allstot. *Id.* ¶ 26. Gullett had a Contact Center Specialist II sit with Allstot for an entire day, observe how she was doing, and provide feedback on how she can improve. *Id.* Gullett also gave Allstot periodic in-person coaching from other contact center specialists. *Id.* ¶ 27. While Gullett also counseled other contact center

specialists who were making mistakes, Allstot does not know how many ended up receiving corrective action. *Id.* ¶ 31.

Allstot continued making mistakes even after going back and reading huddles. *Id.* ¶ 28. Eventually, Confluence's practice managers asked Gullett to do more to address Allstot's errors. *Id.* ¶ 30.

On October 29, 2015, Gullett issued Allstot a written counseling statement. *Id.* ¶ 32. In the statement, Gullett says, "[Allstot] continues to struggle with job performance. She has a high error rate and continues to take lower than the average number of total calls, taking longer breaks/lunches and is still continuing to have an extremely high amount of time in 'Work State', after counseling and coaching." *Id.* ¶ 33. Gullett established expectations that Allstot's "'[e]rror rate needs to decrease down to no more than 5 errors in the next 30 days and moving forward' and that she needed to take only '15 minutes each for breaks and 1 hour for lunches.'" *Id.* ¶ 34 (alteration in original). Additionally, Gullett reminded Allstot her "[f]ailure to meet and maintain acceptable standards of performance . . . will result in further discipline up to and including termination of employment." *Id.* ¶ 35 (alteration and omission in original).

On November 20, 2015, Central counseled Allstot about inappropriately referring to a patient as "a real witch." *Id.* ¶ 36. And on December 2, 2015, Allstot cleaned out her desk because she thought Central was going to terminate her

employment. *Id.* ¶ 37. Allstot's superiors never told her it was acceptable for her to keep making mistakes after receiving training, coaching, and counseling. *Id.* ¶ 38.

On January 11, 2016, Gullett told Allstot that she had "been taking long lunches lately," that Gullett was "concerned with the amount of them," and that Allstot needed "to be consistent at 1 hour lunches please." *Id.* ¶ 72. Gullett suggested Allstot "[m]aybe set an alarm to help?" *Id.* (alteration in original).

On January 19, 2016, Gullett emailed Allstot, notifying her that Central discovered nine errors she made in the six weeks between November 27, 2015 and January 14, 2016. *Id.* ¶ 39. Three days later, Central presented Allstot with a last chance agreement. *Id.* ¶ 40. Confluence fires employees that do not sign such agreements. *Id.* ¶ 100. The agreement warned Allstot "[b]y signing this Last Chance Agreement you understand that ANY violation of CH's work rules or policies . . . will result in your immediate termination from employment." *Id.* ¶ 41 (alteration and omission in original). The agreement also warned Allstot "[t]here will be no further corrective action taken in the event of a performance, attitude or behavior problem, unapproved tardy, absence or policy violation." *Id.* ¶ 42.

The last chance agreement referenced Allstot's pattern of tardiness after returning from rest breaks and lunch breaks. *Id.* ¶ 44 ("From 12/3/15-1/12/16, Kathy has 13 occurrences of tardiness from rest breaks and from 12/9/15-1/11/16 she has an additional 10 occurrence of tardiness from lunch breaks. This behavior was

addressed on 6/2/15, 10/16/15-updated 11/4/15 and again on 1/11/16."). But the agreement did not reference Allstot's medical condition or FMLA leave. *Id.* ¶ 43.

Allstot knew Central would terminate her employment if she made any further mistake after signing the last chance agreement. *Id.* ¶ 45. The agreement was not just for attendance but for *any mistake*. *Id.* ¶ 46. Allstot's errors persisted after she signed the last chance agreement. *Id.* ¶ 48. Thus, Allstot cleaned out her desk again the day after she signed the agreement. *Id.* ¶ 47. But Central did not, in fact, fire Allstot on that date. *See id.* ¶¶ 47, 50. Instead, Allstot continued working another thirty-nine days after signing the last chance agreement. *See id.* In that period, sometime in February 2016, Gullett informed Allstot she had received complaints about her job performance from patients. *Id.* ¶ 49. According to Allstot, Gullett also told Allstot she "was doing better" and "had nothing to worry about." ECF No. 48-1 at 140.

Finally, Central terminated Allstot's employment on March 1, 2016, telling her the reason for her discharge was that she continued to make errors. ECF No. 83 ¶¶ 50, 51. Allstot's discharge was based on her last chance agreement. *Id.* ¶ 101. Allstot acknowledged, "I was told due to my errors and lack of attention to detail that I wasn't a good fit for that particular position at the Contact Center." *Id.* ¶ 52.

During her tenure at the contact center, Allstot's balance of available FMLA leave never ran down to zero. *Id.* ¶ 55. Moreover, Allstot's superiors never told her she was unable to visit a doctor due to an insufficient balance of available FMLA

leave to cover the absence. *Id.* ¶ 58. Nonetheless, Allstot chose to schedule her medical appointments after hours to accommodate her job. *Id.* ¶ 102.

When Allstot was unsure about her balance of available FMLA leave, she would ask Brianna Thaut from Confluence's human resources department. *Id.* ¶ 56. At one point, Thaut questioned the legitimacy of Allstot's FMLA leave. ECF No. 48-1 at 54, 222–23. Thaut was not part of Central's decision to terminate Allstot's employment nor was she ever consulted about that decision. ECF No. 83 ¶ 53.

In fall 2015, Central did not require Allstot to recertify her previously approved FMLA leave request. *Id.* ¶ 57. In early February 2016, Allstot requested recertification of intermittent FMLA leave for two reasons: (1) for her various chronic illnesses because she expected to need time off to attend appointments with various healthcare providers and address any problems that might arise, and (2) to care for her aging mother. *Id.* ¶¶ 59−60. Thaut handled Allstot's request, which Central approved on February 25, 2016. *Id.* ¶¶ 61−62, 104. When Central terminated Allstot's employment on March 1, 2016, she did not have any outstanding or unfulfilled requests to take FMLA leave. *Id.* ¶ 63.

Confluence had written policies regarding both attendance and absence notification, which applied to all Central employees including Allstot. *Id.* ¶¶ 65−66. Allstot reviewed both policies in her tenure at the contact center. *Id.* ¶ 68. Allstot admits she was sometimes tardy, explaining it was for reasons such as letting her

dogs out, going to the bank, or other reasons not related to her medical condition or FMLA leave. *Id.* ¶¶ 69−70. Allstot says her lunch breaks lasted longer than they should because she was "late probably leaving [her] house from letting the dogs out," an occurrence which "has to do with traffic." *Id.* ¶ 71. Many or all contact center employees were late to their shifts at one time or another. *Id.* ¶ 97. Some contact center employees were late multiple times but were not terminated. *Id.* ¶ 98.

On October 19, 2015, Allstot asked Central about the possibility of transferring to a part-time job. *Id.* ¶ 74. Central generally requires its part-time employees to comply with the same attendance and absence notification policies as full-time employees. *Id.* ¶ 75. Allstot originally transferred into the contact center because "it was just getting to be too much doing 12-hour shifts, three in a row, and trying to help [her] dad at home with [her] mother." *Id.* ¶ 76.

Returning to her prior job as a nurse assistant would have required Allstot to routinely perform highly physical tasks such as lifting and dressing patients, helping patients with toilet activities, assisting with patient transport, and setting up and cleaning rooms. *Id.* ¶ 77. It also would have required continuous walking; frequent standing; reaching above shoulder height; and lifting, pulling, and pushing as much as fifty pounds. *Id.* But Allstot was not capable of performing any job involving lifting, such as what might be required of a nurse assistant. *Id.* ¶ 78. Within a month after her discharge, Allstot applied for disability benefits from the Social Security

Administration, claiming she was totally disabled and unable to work as of March 1, 2016, due to a back injury. *Id.* ¶ 79.

Allstot sued Defendants on October 24, 2016. ECF No. 1. Defendants moved for summary judgment on June 1, 2018. ECF No. 40. Allstot responded on June 22, 2018 and Defendants replied on July 6, 2018. ECF Nos. 46, 53. The Court heard the parties' oral argument on August 2, 2018.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant a summary judgment motion. *Id.* at 322. "When the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (internal quotation marks omitted). When considering a summary judgment

motion, the Court does not weigh the evidence or assess credibility; instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

### A.    FMLA violation claims

The FMLA prohibits interference with and retaliation for using or attempting to use protected leave. Allstot makes both claims.

### 1.    FMLA interference claim

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). An allegation that an employer violated this section is known as an FMLA "interference" claim. *Sanders v. City of Newport*, 657 F.3d 772, 777–78 (9th Cir. 2011).

To establish a prima facie case of FMLA interference, an employee must show (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to FMLA leave, (4) she provided sufficient notice of her intent to take FMLA leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Id.* at 778. An employer violates the FMLA's anti-interference provision if it "use[s] the taking of FMLA leave as a negative factor in employment actions." *Bachelder v. Am. W. Airlines, Inc.*, 259

F.3d 1112, 1122–24 (9th Cir. 2001) (emphasis omitted) (quoting 29 C.F.R. § 825.220(c)).

Allstot cannot meet the fifth element of a prima facie case because she presents no evidence showing Defendants denied her FMLA benefits to which she was entitled. Indeed, the record shows she got every FMLA benefit she asked for.

Similarly, Allstot presents no evidence showing Defendants used her taking of FMLA leave as a negative factor in their employment actions. It is undisputed that Defendants fired Allstot because she violated her last chance agreement by continuing to be tardy and making an unacceptable rate of on-the-job errors.

Allstot asserts the recertification of intermittent FMLA leave five days before her discharge triggers an inference that the recertification was a negative factor in Defendants' decision to fire her. The timing is not suspicious. Allstot's extensive and freely granted FMLA leave in the four years she worked for Defendants belies her argument that the recertification in any way impacted their decision to fire her. *See Kelley v. Amazon.com, Inc.*, 652 F. App'x 524, 527 (9th Cir. 2016). Defendants were not required to refrain from enforcing the last chance agreement—a disciplinary course of action set in place before the recertification—simply because of the recertification. *See Swan v. Bank of Am.*, 360 F. App'x 903, 906 (9th Cir. 2009). Under the totality of circumstances, the temporal proximity between the recertification and Allstot's discharge is insufficient, standing alone, to trigger an

inference that the recertification was a negative factor in Defendants' decision to fire her. *See Dilettoso v. Potter*, 243 F. App'x 269, 272–73 (9th Cir. 2007); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005); *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

No genuine dispute exists regarding the episode in which Thaut questioned the legitimacy of Allstot's FMLA leave. This isolated incident occurred long before Defendants fired Allstot, a decision in which Thaut had no input and about which Defendants never consulted her.

Because Allstot fails to establish a prima facie case, the Court grants Defendants' summary judgment motion on Allstot's FMLA interference claim.

### 2.    FMLA retaliation claim

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An allegation that an employer violated this section is known as an FMLA "retaliation" claim. *Sanders*, 657 F.3d at 777.

Under the *McDonnell Douglas* burden-shifting framework,[2] an employee must first establish a prima facie case of FMLA retaliation. *Sanders*, 657 F.3d at

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Ninth Circuit has not decided whether the *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims. *Sanders*, 657 F.3d at 777; *Bachelder*, 259 F.3d at 1125

777 n.3. To establish a prima facie case of FMLA retaliation, an employee must show (1) she availed herself of a protected right under the FMLA, (2) she was adversely affected by an employment decision, and (3) a causal connection exists between the two actions. *Kelleher v. Fred Meyer Stores Inc.*, 302 F.R.D. 596, 598 (E.D. Wash. 2014). If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Sanders*, 657 F.3d at 777 n.3. If the employer articulates a legitimate reason for the action, the employee must show the reason given is pretextual. *Id.* The employee can prove pretext either indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or directly, by showing that unlawful discrimination more likely motivated the employer. *Id.*

Allstot cannot meet the third element of a prima facie case because she presents no evidence establishing a causal connection between her taking of FMLA leave and Defendants' decision to fire her.

Even if Allstot could establish a prima facie case, her claim does not survive the *McDonnell Douglas* framework. Defendants articulated a legitimate,

---

n.11. But the parties agree it should apply. ECF No. 40 at 9; ECF No. 46 at 5; *see also Kelleher v. Fred Meyer Stores Inc.*, 302 F.R.D. 596, 598 (E.D. Wash. 2014).

nondiscriminatory reason for firing Allstot—she violated her last chance agreement by continuing to be tardy and make an unacceptable rate of on-the-job errors.

Allstot fails to show this reason is unworthy of credence, as required to demonstrate it is pretextual. Allstot argues the last chance agreement was itself retaliatory or otherwise illegal. She asserts it was imposed due to her taking of FMLA leave. This argument finds no support in the record. The last chance agreement does not mention Allstot's absences. Allstot admits she was sometimes tardy for non-disability-related reasons such as her own personal choices. And undisputed evidence shows Allstot continued to make errors. Critically, Allstot presents no evidence that her tardiness or error issues were due to her disability. While Allstot claims other non-disabled employees with tardiness or error issues were not fired like she was, she fails to show they signed last chance agreements like her. Thus, Allstot's argument that her violation of the last chance agreement was a pretextual reason for firing her is baseless.

Because Allstot fails to establish a prima facie case and fails to show the reason given for her discharge was pretextual, the Court grants Defendants' summary judgment motion on Allstot's FMLA retaliation claim.

## B.    WLAD claims

The WLAD prohibits all disability discrimination, including disparate treatment, retaliation, and failure to accommodate. Allstot makes all three claims.

### 1. WLAD disparate treatment claim

The WLAD makes it "an unfair practice for any employer . . . [t]o discharge or bar any person from employment because of . . . the presence of any sensory, mental, or physical disability." Wash. Rev. Code (RCW) § 49.60.180(2). Nevertheless, "the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved." RCW 49.60.180(1).

To establish a prima facie case of WLAD disability discrimination based on disparate treatment, an employee must show she was "[1] disabled, [2] subject to an adverse employment action, [3] doing satisfactory work, and [4] discharged under circumstances that raise a reasonable inference of unlawful discrimination." *Brownfield v. City of Yakima*, 316 P.3d 520, 533 (Wash. Ct. App. 2014) (alterations in original) (quoting *Callahan v. Walla Walla Hous. Auth.*, 110 P.3d 782, 786 (Wash. Ct. App. 2005)). The employee "must establish specific and material facts to support each element of . . . her prima facie case." *Anica v. Wal-Mart Stores, Inc.*, 84 P.3d 1231, 1236 (Wash. Ct. App. 2004).

The *McDonnell Douglas* burden-shifting framework applies in this context. "An employee claiming discrimination must first prove a prima facie case of discrimination and, if he or she does so, then the burden shifts to the employer to present evidence suggesting a nondiscriminatory reason for [the termination]."

*Brownfield*, 316 P.3d at 533 (alteration in original) (quoting *Swinford v. Russ Dunmire Oldsmobile, Inc.*, 918 P.2d 186, 193 (Wash. Ct. App. 1996)). "If the employer sustains its burden, the employee must then demonstrate that the reasons given by the employer are pretext for discrimination." *Id.* (quoting *Swinford*, 918 P.2d at 193).

Allstot cannot meet the third element of a prima facie case because she fails to show she was doing satisfactory work. Allstot admits she was sometimes tardy for non-disability-related reasons such as her own personal choices. And undisputed evidence shows Allstot continued to make errors. "An employee's assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of discrimination." *Chen v. State*, 937 P.2d 612, 617 (Wash. Ct. App. 1997); *cf. Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").

Additionally, Allstot cannot meet the fourth element of a prima facie case because she fails to show Defendants discharged her under circumstances raising a reasonable inference of unlawful discrimination. An employee must meet the "substantial factor" test of causation, which requires showing her disability was a substantial factor causing discrimination. *Brownfield*, 316 P.3d at 532 (quoting *Fell v. Spokane Transit Auth.*, 911 P.2d 1319, 1328 (Wash. 1996)). But Allstot presents

no evidence suggesting her medical condition was a substantial factor in Defendants' decision to fire her.

Even if Allstot could establish a prima facie case, her claim does not survive the *McDonnell Douglas* framework for all the same reasons as her FMLA retaliation claim.[3]

Because Allstot fails to establish a prima facie case and fails to show the reason given for her discharge was pretextual, the Court grants Defendants' summary judgment motion on Allstot's WLAD disparate treatment claim.

### 2. WLAD retaliation claim

The WLAD makes it "an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." RCW 49.60.210(1).

To establish a prima facie case of WLAD disability discrimination based on retaliation, an employee must show (1) she engaged in statutorily protected activity,

---

[3] "A court may grant summary judgment even though the plaintiff establishes a prima facie case and presents some evidence to challenge the defendant's reason for its action." *Tyner v. State*, 154 P.3d 920, 928–29 (Wash. Ct. App. 2007) (quoting *Milligan v. Thompson*, 42 P.3d 418, 423 (Wash. Ct. App. 2002)). "[W]hen the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the [employee] created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred, summary judgment is proper." *Id.* at 929 (internal quotation marks omitted) (quoting *Milligan*, 42 P.3d at 423).

(2) she suffered an adverse employment action, and (3) a causal link exists between her activity and her employer's adverse action. *Tyner v. State*, 154 P.3d 920, 928 (Wash. Ct. App. 2007).

The *McDonnell Douglas* framework applies in this context. "'If the employee makes out a prima facie case, the burden shifts to the employer to show a legitimate, nondiscriminatory basis' for its actions." *Id.* (quoting *Milligan v. Thompson*, 42 P.3d 418, 423 (Wash. Ct. App. 2002)). "This shifts the burden back to the [employee] to prove that the employer's reason is pretextual." *Currier v. Northland Servs., Inc.*, 332 P.3d 1006, 1011 (Wash. Ct. App. 2014). "The trier of fact must then 'choose between inferences when the record contains reasonable but competing inferences of both discriminatory and nondiscriminatory actions.'" *Id.* (quoting *Burchfiel v. Boeing Corp.*, 205 P.3d 145, 153 (Wash. Ct. App. 2009)).

Allstot cannot meet the first element of a prima facie case because she fails to show she engaged in statutorily protected activity opposing workplace discrimination. The WLAD "provides protection . . . when an employee opposes forbidden practices." *Lodis v. Corbis Holdings, Inc.*, 292 P.3d 779, 787 (Wash. Ct. App. 2013). "The term 'oppose,' undefined in the [WLAD], carries its ordinary meaning: 'to confront with hard or searching questions or objections' and 'to offer resistance to, contend against, or forcefully withstand.'" *Id.* (quoting *Webster's*

*Third New International Dictionary* 1583 (2002)). Allstot presents no evidence she did anything of the sort.

Additionally, Allstot cannot meet the third element of a prima facie case because she fails to show a causal link exists between some protected activity and her discharge. "A plaintiff proves causation by showing that retaliation was a substantial factor motivating the adverse employment action." *Currier*, 332 P.3d at 1011. But Allstot presents no evidence showing retaliation was a substantial factor in Defendants' decision to fire her.

Even if Allstot could establish a prima facie case, her claim does not survive the *McDonnell Douglas* framework for all the same reasons as her FMLA retaliation claim and WLAD disparate treatment claim.

Because Allstot fails to establish a prima facie case and fails to show the reason given for her firing was pretextual, the Court grants Defendants' summary judgment motion on Allstot's WLAD retaliation claim.

### 3.    WLAD failure to accommodate claim

The WLAD "requires an employer to reasonably accommodate an employee with a disability unless the accommodation would pose an undue hardship." *Frisino v. Seattle Sch. Dist. No. 1*, 249 P.3d 1044, 1049 (Wash. Ct. App. 2011). "[A]n employer is not required to reassign an employee to a position that is already

occupied, create a new position, or eliminate or reassign essential job functions." *Id.*

To establish a prima facie case of WLAD failure to accommodate, an employee must show (1) she had a sensory, mental, or physical abnormality that substantially limited her ability to perform her job; (2) she was qualified to perform the essential functions of her job; (3) she gave her employer notice of her abnormality and its accompanying substantial limitations; and (4) upon notice, her employer failed to affirmatively adopt measures that were available to it and medically necessary to accommodate her abnormality." *Anica*, 84 P.3d at 1236–37.

"Where multiple potential modes of accommodation exist, the employer is entitled to select the mode; the employee is not." *Frisino*, 249 P.3d at 1050. "The employer then has the right to stand on its mode of accommodation, to the exclusion of other choices, if the accommodation is adequate." *Id.* "If the attempted accommodation is not adequate, the employer may attempt another mode of accommodation, or assert that the remaining available modes of accommodation constitute an undue hardship." *Id.* The primary inquiry is "whether the [employer]'s attempt at accommodation was effective in removing the cause of the substantially limiting symptoms." *Id.* Once an employer reasonably accommodates an employee, the employer "d[oes] not have a further responsibility to accommodate [the

employee] until she g[ives] sufficient notice of her need for further accommodation." *Anica*, 84 P.3d at 1237.

Allstot does not specify what else she believes Defendants could or should have done for her. Allstot fails to show Defendants had any other measures available to accommodate her medical condition. Because Allstot's job was designed to meet Defendants' specific contact center needs during business hours, they could not be expected to change when she worked or what she did during work, nor could they be expected to make attendance anything other than mandatory. Defendants had no other available job that Allstot could perform. And Defendants were not required to create a new job for Allstot, whether part-time or otherwise.

Moreover, Allstot fails to show any other measures were medically necessary to accommodate her condition. At oral argument, Allstot's attorney acknowledged he is not aware of any evidence showing she needed part-time work. No genuine dispute exists regarding the effectiveness of the measures Defendants took, which included schedule modifications to accommodate her needs as they arose. And Allstot never notified Defendants of her need for further accommodation.

Because Allstot fails to establish a prima facie case, the Court grants Defendants' summary judgment motion on Allstot's WLAD failure to accommodate claim.

## C.    Wrongful discharge claim

"Washington provides a private common law tort remedy when an employer discharges an at-will employee 'for a reason that contravenes a clear mandate of public policy.'" *Becker v. Cmty. Health Sys., Inc.*, 332 P.3d 1085, 1088 (Wash. Ct. App. 2014) (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984)), *aff'd*, 359 P.3d 746 (Wash. 2015). This tort is "'narrow,' meaning the employee has the burden of proving the dismissal violates a clear mandate of public policy." *Rickman v. Premera Blue Cross*, 358 P.3d 1153, 1158 (Wash. 2015) (quoting *Thompson*, 685 P.2d at 1089).

"To state a cause of action, the plaintiff must plead and prove that his or her termination was motivated by reasons that contravene an important mandate of public policy." *Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015). This includes "a strict clarity requirement in which the plaintiff must establish that the public policy is clearly legislatively or judicially recognized." *Id.* "Once established, the burden shifts to the employer to plead and prove that the employee's termination was motivated by other, legitimate, reasons." *Id.*

This tort usually arises in one of several scenarios, such as "when employees are fired for exercising a legal right or privilege." *Rose v. Anderson Hay & Grain Co.*, 358 P.3d 1139, 1147 (Wash. 2015). In other instances where the facts do not

fit neatly into a typical category, "a more refined analysis may be necessary" and the Court obtains guidance from the following four-part framework:

> (1) the existence of a "clear public policy" (clarity element), (2) whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" (jeopardy element), (3) whether the "public-policy-linked conduct caused the dismissal" (causation element), and (4) whether the employer is "able to offer an overriding justification for the dismissal" (absence of justification element).

*Id.* at 1143, 1147 (alteration in original) (quoting *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377, 382 (Wash. 1996)).

The employee must meet the "substantial factor" test of causation, which requires showing "the employee's conduct in furthering a public policy was a substantial factor motivating the employer to discharge the employee." *Rickman*, 358 P.3d at 1160 (internal quotation marks omitted).

By contrast, "[t]he 'absence of justification' element examines whether the employer can 'offer an overriding justification for the [discharge],' 'despite the employee's public-policy-linked conduct.'" *Id.* (second alteration in original) (citation omitted) (quoting *Gardner*, 913 P.2d at 385). "Once a plaintiff presents a prima facia [sic] case . . . , the burden of proof shifts to the employer to show the termination was justified by an overriding consideration." *Id.*

Allstot's wrongful discharge claim fails for the same reasons as her other claims. *Cf. Becker v. Cashman*, 114 P.3d 1210, 1215 (Wash. Ct. App. 2005)

(affirming summary judgment on a claim of wrongful discharge in violation of public policy premised on the same facts and suffering the same deficiency as a claim of disability discrimination under the WLAD lacking evidence of causation).

Because Allstot fails to establish a prima facie case and Defendants offer an overriding justification for firing her, the Court grants Defendants' summary judgment motion on Allstot's wrongful discharge claim.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Defendants' Motion for Summary Judgment, **ECF No. 40**, is **GRANTED**.

2.  All pending motions are **DENIED AS MOOT**.

3.  All hearings and other deadlines are **STRICKEN**.

4.  The Clerk's Office is directed to **ENTER JUDGMENT** for Defendants and **CLOSE** this file.

**IT IS SO ORDERED**. The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 17th day of August 2018.

SALVADOR MENDOZA, JR.
United States District Judge